IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Michael Price, | ) | C/A No.: 1:13-1064-JFA-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a

Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a)

(D.S.C.).  Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for Disability Insurance Benefits ("DIB").  The two

issues before the court are whether the Commissioner's findings of fact are supported by

substantial evidence and whether she applied the proper legal standards.  For the reasons

that follow, the undersigned recommends that the Commissioner's decision be remanded

for further proceedings as set forth herein.

I.      Relevant Background

        A.      Procedural History

        On April 13, 2009, Plaintiff filed an application for DIB in which he alleged his

disability began on March 6, 2006.  Tr. at 165.  His application was denied initially and

upon reconsideration.  Tr. at 108–09, 114–15.  On June 17, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Linda Haack.  Tr. at 65-96 (Hr'g Tr.).  During the hearing, Plaintiff, with the advice and consent of his attorney, amended the alleged onset date to September 10, 2009.  Tr. at 66.  The ALJ issued an unfavorable decision on July 20, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 37–55.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–4.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on April 19, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 49 years old at the time of the hearing.  Tr. at 67.  He completed high school.  Tr. at 68.  His past relevant work ("PRW") was as a drywall hanger/framer, a duct mechanic, a dump truck driver, a framer, a nursing attendant/orderly, a roll-off truck driver, and a roofer.  Tr. at 203.  He alleges he has been unable to work since September 10, 2009.  Tr. at 66.

2.    Medical History

Plaintiff was enrolled in self-contained, learning disabled classes in public school.  Tr. at 315–17.  An evaluation performed on October 15, 1976 indicated that Plaintiff had a verbal IQ of 92, a performance IQ of 91, and a full scale IQ of 91.  Tr. at 319.  A psychological evaluation report dated November 6, 1979, indicated that Plaintiff's verbal

IQ was 73; his performance IQ was 95; and his full scale IQ was 82. Tr. at 316. However, the report also suggests that the scores on the verbal tasks were depressed because of Plaintiff's discomfort with the type of task. *Id.* Plaintiff was noted to recognize words at a tenth grade level and read at a late-seventh grade level. Tr. at 317.

Plaintiff was referred for MRI of the lumbar spine on May 17, 2004, after complaining to William Maguire, M.D. of low back pain, right more than left, and occasional right leg tingling. Tr. at 605. MRI revealed mild degenerative disc disease with eccentric mild right-sided disc protrusion at L4-5 that could impinge upon the right L4 nerve root, as well as degenerative disc disease with shallow diffuse non-stenotic disc protrusion at L5-S1. *Id.*

Dr. Maguire referred Plaintiff for lumbar epidural steroid injections on July 8, 2004, and the two discussed surgery on September 2, 2004. Tr. at 607. Dr. Maguire referred Plaintiff for a second MRI. *Id.* MRI on September 8, 2004 indicated L5-S1 annular tear with disc dessication, but no evidence of disc herniation, canal stenosis or nerve root impingement; L4-5 disc dessication with minimal posterior and posterolateral disc bulging, without nerve root impingement; incidental hypertrophic changes of the narrowed anterior T12-L1 disc space; and nonspecific heterogeneous marrow signal in the sacrum and the L4 and L5 vertebral bodies. Tr. at 610. Plaintiff's pain decreased with conservative intervention by October 5, 2004. Tr. at 607.

Plaintiff presented to David Jaskwhich, M.D. on March 6, 2006, complaining of left heel pain after falling off of a truck at work. Tr. at 335. He was diagnosed with left calcaneal fracture. *Id.*

3

Plaintiff underwent open reduction and internal fixation of the left calcaneus fracture, which was performed by Dr. Jaskwhich on March 9, 2006. Tr. at 354–55.

On April 14, 2006, Plaintiff presented to Dr. Jaskwhich with complaint of right wrist pain. Tr. at 473. X-rays of the right wrist revealed a midway scaphoid fracture, nondisplaced, and possible avascular necrosis of the scaphoid. *Id.* Plaintiff was referred to Timothy G. Allen, M.D. *Id.*

On May 15, 2006, Plaintiff underwent right scaphoid fracture open reduction and internal fixation and vascularized pedicle bone graft from the distal radius to the scaphoid nonunion and the proximal pole avascular necrosis area. Tr. at 483–85.

On January 17, 2007, Dr. Allen indicated that Plaintiff was pleased with the result of his right wrist surgery and was at maximum medical improvement. Tr. at 457–58. He indicated that Plaintiff experienced occasional pain and weakness, which was not severe or consistent, and that Plaintiff had no redness, warmth, or swelling. Tr. at 457. Dr. Allen assessed a 22 percent impairment rating to Plaintiff's right arm based on strength loss, mild discomfort, and mild paresthesias in the sensory nerve distribution of the right wrist. Tr. at 456. Dr. Allen indicated that Plaintiff "can carry out normal job tasks at this point without limitation." *Id.* He released Plaintiff to return to regular duty. Tr. at 564.

Plaintiff treated with Milton S. Costa, M.D. for situational stress reaction, mild anger disorder, situational anxiety with mild depressive component, headaches, and chronic pain in his left foot and right wrist from January 2007 to May 2007. Tr. at 373–76.

4

On July 12, 2007, Plaintiff underwent neuropsychological consultation with Randolph Waid, Ph.D.  Tr. at 377–82.  Plaintiff's spelling skills were assessed in the seventh to eighth grade range.  Tr. at 380.  Plaintiff was functioning in the low average range of intellectual abilities.  Tr. at 382.  Plaintiff demonstrated relative strength with respect to perceptual organizational skills.  *Id.*  He demonstrated weakness with processing speed, working memory, and educationally-oriented verbal comprehension skills.  *Id.*  Plaintiff demonstrated difficulties effectively sustaining concentration with impaired anterograde memory.  *Id.*  Plaintiff demonstrated no receptive or expressive language dysfunction or sensory perceptual impairment.  *Id.*  Motor functioning was compromised by residual pain in the left heel and weakness in the right wrist.  *Id.* Plaintiff also demonstrated difficulties with depression, irritability, impatience, and low frustration tolerance.  *Id.*

Plaintiff complained to Dr. Jaskwhich of continued pain in his left lower extremity during multiple office visits.  Tr. at 509, 512, 516, 519, 523–24.  Plaintiff participated in physical therapy for his left ankle at James Island Physical Therapy from April 18, 2006, to July 13, 2006, and from August 27, 2007, to October 11, 2007.  Tr. at 429–42, 724–45. On September 21, 2007, Dr. Jaskwhich indicated that CT scan showed that most of the fracture sites had healed, except for one major site.  Tr. at 524.  He recommended removal of the hardware and then bone grafting the remaining fracture line with placement of separate hardware at that site.  *Id.*  Dr. Jaskwhich also indicated that Plaintiff's back pain had been worsened by a fall and significant limp on the left foot.  *Id.*

On October 25, 2007, Plaintiff was admitted to Summerville Medical Center because of painful hardware in his left ankle and nonunion of the left calcaneus. Tr. at 393. Plaintiff underwent surgery to remove hardware and repair the nonunion of the left calcaneus with bone grafting. Tr. at 400–01.

Plaintiff participated in physical therapy for his left ankle at James Island Physical Therapy from February 25, 2008, to April 9, 2008. Tr. at 416–28.

On April 14, 2008, Dr. Jaskwhich rated and released Plaintiff. Tr. at 446. He indicated that Plaintiff may require further surgery and would occasionally need anti-inflammatory or narcotic pain medication. *Id.* Dr. Jaskwhich indicated that Plaintiff would be on limited duty, to include restricted climbing, no jumping or heavy pounding on the left leg, an ability to rest and sit comfortably, and avoidance of using a clutch. *Id.* Dr. Jaskwhich also indicated that Plaintiff had a 50-pound lifting restriction. Tr. at 501.

On June 24, 2008, Dr. Jaskwhich assigned Plaintiff impairment ratings of 28 percent to the foot, 20 percent to the lower extremity, and eight percent to the whole person. Tr. at 445. Dr. Jaskwhich reiterated the restrictions indicated on April 14, but added restrictions to work only on level ground and to avoid running and walking for extended periods of time. *Id.*

Dr. Maguire referred Plaintiff for MRI of the lumbar spine on July 28, 2008, which revealed no change from the MRI results of September 8, 2004. Tr. at 611.

On July 30, 2008, Plaintiff underwent an employability evaluation by certified rehabilitation counselor Jean R. Hutchinson, M.Ed. Tr. at 177–85. Ms. Hutchinson concluded that Plaintiff was unable to return to any past employment and lacked

transferable skills to other work within his residual functional capacity. Tr. at 185. She also concluded that Plaintiff's impairments coupled with his learning disabilities prevented him from making an adjustment to any work that existed in significant numbers in the national economy. *Id.*

From October 5, 2008, through November, 7, 2008, Plaintiff participated in a five-week comprehensive vocational evaluation for brain injured clients through South Carolina Vocational Evaluation. Tr. at 720. Plaintiff tolerated a full day of activity for the five-week period at the sedentary to light work level. *Id.* The evaluation report, which was signed by Tammy R. Johnson, M.S., and Debra Rzepkowski, noted that Plaintiff would need accommodations for no kneeling, crouching, stooping, climbing, and crawling. *Id.* The report also noted that Plaintiff could benefit from changing positions frequently between sitting, standing, and walking. *Id.* Plaintiff's upper extremities were rated as frequent in reaching and handling and constant in fingering and feeling. *Id.* Plaintiff identified job objectives of truck driver and recreation aide, which were considered realistic with the stipulation that the truck driver position would require that Plaintiff operate an automatic truck and not perform at higher than light work levels. *Id.*

While enrolled in the five-week program, Plaintiff underwent neuropsychological consultation by John M. Taylor, Ph.D., on October 15, 2008, and October 24, 2008. Tr. at 721–23. Dr. Taylor found that "Mr. Price's neuropsychological testing should not significantly interfere with his ability to participate in vocational rehabilitation and should not significantly interfere with vocational efforts." Tr. at 722. Dr. Taylor

indicated that while Plaintiff learned better through visual presentations, he was able to learn well through verbal information as well. *Id.*

On November 7, 2008, physical therapist Julie Jackman noted that Plaintiff "was very hardworking in all of the physical areas" and that he "has a strong work ethic and wants to give good effort in all areas." Tr. at 756. Ms. Jackman also noted that Plaintiff frequently did too much exercise, increasing his pain level to a point that he would suffer from pain after exercise, but not during it. *Id.*

On November 8, 2008, Plaintiff underwent occupational therapy evaluation by Lee-Ann Danko, OTR/L. Tr. at 753. Ms. Danko noted that Plaintiff was independent in self-care and instrumental activities of daily living; that he could successfully follow and give written instructions; that his memory, attention, and problem solving appeared in the normal range, but that cueing was needed to recall some items; that he had "anticipatory" awareness of his disability, meaning that he could prepare ahead of time to compensate for attentional and memory issues related to his head injury; that his bilateral upper extremities were in the normal range for strength, range of joint motion, and coordination; and that his socialization was appropriate with peers and staff. *Id.*

On February 2, 2009, and March 3, 2009, Plaintiff presented to Milton Costa, M.D. with complaint of intermittent low back pain. Tr. at 762–64. Dr. Costa referred Plaintiff for orthopedic consultation. Tr. at 762.

On March 17, 2009, June 1, 2009, and June 29, 2009, Plaintiff presented to Dr. Maguire with complaints of back pain. Tr. at 840. Plaintiff indicated to Dr. Maguire that he could not afford to receive injections. *Id.* Dr. Maguire prescribed Lortab and

8

Dilaudid.  *Id.*  Plaintiff also complained of depression on June 29, 2009, and Dr. Maguire prescribed Celexa.  *Id.*

On June 22, 2009, Plaintiff underwent orthopedic examination with consultative examiner Kerri A. Kolehma, M.S., M.D.  Tr. at 807–10.  Dr. Kolehma noted that Plaintiff demonstrated antalgic gait with and without a cane, but that his gait was more antalgic without the cane.  Tr. at 807.  Plaintiff had normal range of motion of all joints except the left ankle.  Tr. at 808.  Left ankle dorsiflexion was reduced at 10 degrees.  Tr. at 810. Plaintiff had decreased sensation over the scar and dorsum of his left foot.  Tr. at 808.  He was unable to tandem walk.  *Id.*  He had moderate crepitus, but normal range of motion in the right knee.  *Id.*  Dr. Kolehma indicated that Plaintiff should continue the restrictions given by his surgeon.  *Id.*  She further indicated that Plaintiff had normal function in his upper extremity and that he could communicate without restrictions.  *Id.*

X-ray of the lumbar spine on June 22, 2009, indicated grade I retrolisthesis of L5 on S1; superior endplate deformities of L1 through L4; wedging of T11 and T12; and diffuse osteopenia.  Tr. at 812.

X-ray of the left ankle on June 22, 2009 indicated evidence of post-traumatic change; soft tissue swelling; and diffuse osteopenia.  Tr. at 813.

On June 24, 2009, state agency evaluator Jim Liao, M.D. completed a physical residual functional capacity assessment.  Tr. at 814–22.  Dr. Liao indicated the following limitations: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday;

occasionally push and/or pull with the left foot; occasionally climb ramp/stairs, balance, stoop, knee, crouch, and crawl; and never climb ladder/rope/scaffolds.  Tr. at 815–16.

Also on June 24, 2009, state agency evaluator Judith Von, Ph.D. completed a psychiatric review technique.   Tr. at 822–35.   Dr. Von determined that Plaintiff's impairments included history of learning disability, situational anxiety, and alcohol abuse in remission, but that his impairments were not severe.  Tr. at 822–23, 827, 830.  Dr. Von found that Plaintiff had no restriction of activities of daily living; no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 832.

On July 1, 2009, Plaintiff presented to Dr. Maguire with complaint of chest pain. Tr. at 839.  His blood pressure was 120/80.  *Id.*  Dr. Maguire suggested that Plaintiff may be experiencing reflux.  *Id.*

Plaintiff was admitted to Roper Hospital from September 10, 2009, to September 22, 2009, with diagnoses of cardiogenic shock, myocardial infarction, chronic obstructive pulmonary disease, respiratory failure, acute renal failure, probable gastrointestinal bleed, and enterococcal urinary tract infection.  Tr. at 845–47.  Cardiac catheterization revealed a 100 percent blockage of the mid left anterior descending ("LAD") artery.  Tr. at 846. An angioplasty was performed, and a stent was placed.  *Id.*  On September 21, 2009, Plaintiff underwent PermCath placement because he was requiring dialysis due to acute renal failure.  Tr. at 848–49.

Plaintiff was admitted to Roper Hospital from September 28–29, 2009, due to complaint of chest pain.  Tr. at 850–52.  Echocardiography revealed anterior wall akinesis, apical dyskinesis, and ejection fraction of 35 percent.  Tr. at 883.

On October 2, 2009, Plaintiff presented to cardiologist Scott L. Woodfield, M.D., following a near-syncopal episode.  Tr. at 881.  Dr. Woodfield indicated that he suspected orthostatis and low blood pressure to be the sources of the problem, and he decreased Plaintiff's Coreg dosage from 12.5 mg twice a day to 6.25 mg twice a day.  *Id.*

Plaintiff underwent surgical removal of PermCath on October 12, 2009, because his kidneys had completely recovered, and he had not used the PermCath for at least three weeks.  Tr. at 842.

On October 16, 2009, Plaintiff complained of lightheadedness and bilateral leg pain to Dr. Woodfield.  Tr. at 880.  Dr. Woodfield recommended that Coreg be decreased to 3.125 mg.  *Id.*  He indicated that Simvastatin might have caused the leg pain, and that it should be eliminated for five days for Plaintiff to determine if it was causing the leg pain. *Id.*

Plaintiff participated in cardiac rehabilitation at Roper Hospital between October 19, 2009, and December 30, 2009.  Tr. at 1127.  Plaintiff's attendance was noted to be good and his exercise tolerance was noted to be good, but limited by chronic back pain and previous heel fracture.  *Id.*  The site coordinator Amy R. Levine noted that "[p]atient does not work and is limited from activities due to back pain." *Id.*

Plaintiff presented to Dr. Maguire on October 29, 2009, with complaint of low back pain.  Tr. at 968.  Dr. Maguire prescribed Percocet to Plaintiff.  *Id.*

Plaintiff followed up with Dr. Woodfield on November 13, 2009, and reported improvement.  Tr. at 1133.  Echocardiogram revealed ejection fraction improved to 40 percent or slightly more, with an extensive area of apical severe hypokinesis.  Tr. at 925.

Plaintiff presented to Brett Baker, M.D. on November 19, 2009.  Tr. at 919.  His ejection fraction was noted to be improved with medical therapy.  *Id.*

On December 3, 2009, Plaintiff complained of low back pain to Dr. Maguire.  Tr. at 967.  Dr. Maguire referred Plaintiff for MRI of the lumbar spine.  *Id.*

On December 8, 2009, Plaintiff underwent MRI of the lumbar spine, which indicated no changes in the spine as compared to the MRI from September 8, 2004.  Tr. at 973–74.

Also on December 8, 2009, Plaintiff participated in overnight polysomnography, which revealed restless leg syndrome/period limb movement disorder and mild obstructive sleep apnea.  Tr. at 948.

Plaintiff followed up with Jeffery J. Dorociak, M.D., Ph.D., on December 18, 2009, for anemia.  Tr. at 939.  His hemoglobin was 12.3.  *Id.*

On December 30, 2009, Plaintiff presented to Bon Secours St. Francis Hospital for lumbar epidural steroid injection.  Tr. at 972.

Plaintiff followed up with Suzan Kleckley, ANP, on January 4, 2010, regarding renal function.  Tr. at 954–55.  His renal function was noted to be normal, and he was instructed to follow up as needed.  Tr. at 955.

Plaintiff presented to Leonard E. Forrest, M.D., on January 6, 2010, regarding worsening symptoms in his back and legs.  Tr. at 960.  Dr. Forrest noted that, according

to the official report from the radiologist who reviewed Plaintiff's MRI done on December 8, 2009, there was "no real change" between the 2004 MRI and that MRI.  Tr. at 961.  Dr. Forrest recommended that Plaintiff be treated non-operatively and that he continue to receive injections.  *Id.*  Dr. Forrest prescribed to Plaintiff a back brace to be used not for "usual activities of daily living," but "when he is doing anything that is more stressful on his back, which could include housework and yard work, shopping, etc." *Id.* He also prescribed Darvocet.  *Id.*

Plaintiff followed up with Dr. Woodfield on January 21, 2010, after experiencing faintness and almost passing out the previous Saturday.  Tr. at 981.  He indicated that he was doing pretty well from a cardiac standpoint, but that he was experiencing severe depression and chronic low back pain.  *Id.*  Dr. Woodfield opined that Plaintiff may be experiencing symptomatic bradycardia, and he placed a Holter monitor on Plaintiff.  *Id.*

On January 27, 2010, Plaintiff complained of increased symptoms of depression to Dr. Maguire.  Tr. at 967.

On January 29, 2010, Plaintiff complained of episodic sharp chest pain to Dr. Woodfield.  Tr. at 983.  Dr. Woodfield noted that Plaintiff did not have bradycardia, according to the results from the Holter monitor.  *Id.*  He recommended nuclear stress test to assess Plaintiff's complaint of chest pain.  *Id.*

Plaintiff underwent nuclear stress test on February 4, 2010, which revealed a large area of infarction (consistent with Plaintiff's history of myocardial infarction in September 2009) and calculated ejection fraction of 48 percent with wall motion abnormalities.  Tr. at 984.

Plaintiff followed up with Dr. Woodfield on February 17, 2010, and reported no further chest pains. Tr. at 985. Plaintiff continued to complain of intermittent lightheadedness, and Dr. Woodfield indicated that Plaintiff's chronic pain medications may be the source. *Id.*

On March 4, 2010, Plaintiff was admitted to Roper Hospital for overnight observation after presenting to the emergency room with complaint of chest pressure, which was determined to be non-ischemic. Tr. at 1081–82.

Plaintiff followed up with Dr. Woodfield on March 19, 2010. Tr. at 1132. Plaintiff indicated that he had been "quite stressed out a lot." *Id.* Plaintiff reported recent episodes of chest pain, and Dr. Woodfield indicated that, if the episodes continued, they would need to proceed with heart catheterization. *Id.* Dr. Woodfield noted that Plaintiff's ejection fraction had improved to 48 percent. *Id.*

Plaintiff presented to the emergency room at Roper Hospital with complaint of chest pain on March 24, 2010. Tr. at 1074. Myocardial infarction was ruled out. *Id.* Cardiac catheterization performed on March 25, 2010, demonstrated widely patent LAD stent and ejection fraction of 36 percent. *Id.*

Plaintiff presented to James Island Physical Therapy for initial evaluation regarding low back pain on April 20, 2010. Tr. at 1103. Plaintiff participated in twelve physical therapy sessions between April 20, 2010, and June 8, 2010. Tr. at 1091–1103.

Plaintiff next followed up with Dr. Forrest on April 21, 2010, regarding his back pain. Tr. at 987. Plaintiff indicated to Dr. Forrest that his back pain was reduced by receiving injections and exacerbated by activity. *Id.* Dr. Forrest referred Plaintiff for

14

EMG and nerve conduction study of both lower extremities to assess for a possible neurologic deficit. *Id.* He also indicated that the source of Plaintiff's pain may be a facet joint problem. *Id.*

Plaintiff had EMG and nerve conduction studies performed on his bilateral lower extremities on April 23, 2010. Tr. at 989. The studies showed no evidence of radiculopathy, lumbosacral plexopathy, or peripheral compressive neuropathy. *Id.* Dr. Forrest indicated that Plaintiff's lower extremity symptoms likely originated in his back and were symptoms of radiculitis, as opposed to radiculopathy. Tr. at 988. Dr. Forrest also indicated that he suspected symptoms were coming from the low lumbar facet joints and referred Plaintiff to Dr. Richardson for treatment. *Id.* Dr. Forrest again encouraged Plaintiff to obtain and use a back brace when performing activities. *Id.*

On April 26, 2010, Plaintiff presented to William Blane Richardson, M.D. for initial consultation. Tr. at 1002–07. Dr. Richardson noted that Plaintiff's back pain was "sharp, dull achy pain with numbness and cramping just across the back." Tr. at 1002. He indicated that Plaintiff's pain rarely radiated down the hips and never radiated past the thigh or the knee. *Id.* Dr. Richardson wrote that Plaintiff reported worsened pain with any activity, bending, standing, and twisting. *Id.* Dr. Richardson also indicated that Plaintiff reported relief when lying down and when his legs were slightly bent. *Id.* Dr. Richardson wrote that Plaintiff indicated that he was taking up to eight 10 mg Lortabs daily. *Id.* Dr. Richardson performed a physical examination and noted the following findings: decreased range of motion with hip flexion and extension; positive facet loading bilaterally in the lumbar region; tenderness to palpation in the lumbar region; deep tendon

15

reflexes +2 in the patella and Achilles; 5/5 strength in the lower extremities; grossly intact sensory response; cranial nerves grossly intact; negative straight leg raise bilaterally; and Patrick's test negative bilaterally for SI joint instability. Tr. at 1004. Dr. Richardson indicated that he planned to first do a medial branch block bilaterally at L3, 4, and 5, and then to perform a rhizotomy. *Id.*

On May 11, 2010, Plaintiff presented to Dale Marko, M.D. at MUSC Institute of Psychiatry for initial psychiatric evaluation. Tr. at 1030–34. Plaintiff reported depression in the context of chronic pain, which he reported had worsened since he had a heart attack in the fall. Tr. at 1030. Plaintiff reported symptoms of depression that included bouts of tearfulness, increased irritability, and difficulty controlling his temper. *Id.* He denied suicidal thoughts, anhedonia, and appetite disturbance. *Id.* Plaintiff also reported symptoms of anxiety that included worry about his financial situation and his inability to provide for his family. Tr. at 1031. He reported physiological symptoms of anxiety, including racing heart, shortness of breath, and tremors. *Id.* Plaintiff reported having sustained a traumatic brain injury at the age of four, and having some cognitive and behavioral effects from the injury. *Id.* Plaintiff also reported that he and his wife operated a small gumball business. *Id.* Dr. Marko noted that "[i]n light of patient's medical history, his recent heart attack could have resulted in further cognitive deficits from hypoxia suffered during his MI." Tr. at 1033. Dr. Marko continued Plaintiff on Celexa and prescribed Depakote. *Id.*

Plaintiff followed up with Dr. Richardson on May 24, 2010, regarding low back and right hip pain. Tr. at 999. Dr. Richardson noted 5/5 strength in Plaintiff's lower

extremities; positive facet loading bilaterally, right greater than left; +2 deep tendon reflexes in the lower extremities; negative straight leg raise; negative Patrick's test for SI joint instability; and grossly intact sensory response. *Id.* Plaintiff complained of an infected lesion on his left middle finger, and Dr. Richardson referred him to Nason Medical Center for evaluation and antibiotic therapy. *Id.* Plaintiff was originally scheduled for bilateral medial branch block at L3, L4, and L5 on May 27, 2010, but Dr. Richardson noted that this would have to be delayed until Plaintiff was off of antibiotic therapy for at least one to two weeks. *Id.*

Plaintiff saw Dr. Woodfield for routine cardiac follow up on June 9, 2010. Tr. at 1129. Plaintiff indicated to Dr. Woodfield that he was feeling well and having no problems. *Id.*

On June 15, 2010, Plaintiff underwent bilateral lumbar medial branch block at L3, L4, and L5. Tr. at 993–94.

On June 15, 2010, Plaintiff also presented to Dr. Marko for psychiatric treatment. Tr. at 1025–27. Plaintiff reported continued depressed mood with anhedonia, isolative behavior, and tearfulness. Tr. at 1025. Dr. Marko observed Plaintiff to have fair energy, good concentration, logical and linear thought processes, appropriate thought content, normal perception, fair insight, fair judgment, depressed mood, appropriate affect, and normal orientation. Tr. at 1025–26. Dr. Marko assessed a GAF score of 60. Tr. at 1027.

Plaintiff presented to East Cooper Medical Center on June 29, 2010, to undergo lumbar radiofrequency thermal coagulation (rhizotomy procedure) bilaterally at L3, L4, and L5. Tr. at 1108–09.

On July 12, 2010, Plaintiff presented to Dr. Richardson for follow up.  Tr. at 996. Plaintiff reported 10/10 pain following the rhizotomy procedure.  *Id.*  Dr. Richardson indicated that patients typically experienced an exacerbation of pain following the rhizotomy, and that it was too early tell if it was effective.  *Id.*  He switched Plaintiff's pain medication from Percocet to Dilaudid and instructed him to follow up in four weeks. *Id.*

Plaintiff followed up with Dr. Marko on July 13, 2010, for depression secondary to chronic pain.  Tr. at 1022–24.  Dr. Marko indicated that Plaintiff was "quite irritable, irritated, and agitated today."  Tr. at 1022.  Dr. Marko noted that Plaintiff's energy was fair; that his concentration was fair; that his thought processes were logical and linear; that his thought content was appropriate; that his perception was normal; that his behavior was defensive; that he was experiencing anhedonia; that his interactions were isolative; that his insight was fair; that his judgment was poor; that his speech was loud when he became irritated; that his motor activity was tense; that he was awake and alert; that his mood was depressed and irritable; that he was appropriately oriented; that he was partially compliant with medication; and that he denied suicidal or homicidal ideations. Tr. at 1022–23.  Dr. Marko assessed a GAF score of 60.  Tr. at 1024.

Plaintiff presented to Dr. Marko for follow up on July 27, 2010.  Tr. at 1019–21. Plaintiff indicated that he was taking his medications as prescribed and that they were helping him.  Tr. at 1019.  He also indicated that he was not arguing with his wife as frequently.  *Id.*  Dr. Marko indicated that Plaintiff had fair energy, fair concentration, logical and linear thought processes, appropriate thought content, anhedonia, isolative

interactions, impaired insight, fair judgment, normal speech, normal motor activities, depressed mood, appropriate affect, appropriate orientation, and no suicidal or homicidal thoughts. Tr. at 1019–20. Dr. Marko assessed a GAF score of 60. Tr. at 1021.

Plaintiff followed up with Dr. Richardson on August 10, 2010. Tr. at 1117. Plaintiff reported 30 percent relief from the rhizotomy procedure, but also noted that he was "very active" with activities that included fishing and working in his yard. *Id.* Plaintiff reported exacerbation of pain with activity. *Id.* He complained of heel pain, and Dr. Richardson scheduled him for an ankle block procedure. *Id.* Dr. Richardson also switched his medication from Celebrex to Zipsor for breakthrough pain. *Id.*

On August 11, 2010, Plaintiff followed up with Dr. Marko for depression. Tr. at 1015–18. He reported compliance with prescribed medication, but noted that he was "not in a good mood." Tr. at 1015. Dr. Marko indicated that Plaintiff had fair energy, good concentration, logical and linear thought process, good interest, fair insight, normal speech, normal motor activity, depressed mood, appropriate affect, appropriate orientation, and no homicidal or suicidal thoughts. Tr. at 1015–16. Dr. Marko assessed a GAF score of 60. Tr. at 1017.

Plaintiff visited Dr. Marko for depression on August 15, 2010. Tr. at 1153–55. Plaintiff indicated that he was depressed because of his chronic pain. Tr. at 1153. Plaintiff indicated that he and his wife were constantly arguing. *Id.* He also endorsed symptoms including irritability, worried thoughts, and anhedonia. *Id.* Dr. Marko assessed a GAF score of 60. Tr. at 1154.

19

On August 31, 2010, Plaintiff was admitted to East Cooper Medical Center for left ankle block procedure to treat peripheral neuropathy of the left foot.  Tr. at 1106–07.

On September 10, 2010, state agency evaluator Lisa Varner, Ph.D. completed a psychiatric review technique and a mental residual functional capacity assessment.  Tr. at 1040–57.  Dr. Varner recognized impairments including history of learning disability and depression secondary to chronic pain.  Tr. at 1041, 1043.  She indicated that Plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 1050.  Dr. Varner indicated that Plaintiff was moderately limited with respect to the following:  the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain a routine without special supervision; the ability to work in coordination with or proximity to others without being distracted by them; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and the ability to interact appropriately with the general public.  Tr. at 1054–55.

State agency evaluator Katrina B. Doig, M.D., completed a physical residual functional capacity assessment on September 13, 2010.  Tr. at 1058–65.  She indicated that Plaintiff had the following limitations: occasionally lift and/or carry 20 pounds;

20

frequently lift and/or carry 10 pounds; stand and/or walk (with normal breaks) for at least two hours in an eight-hour workday; sit (with normal breaks) for about six hours in an eight-hour workday; push and/or pull limited in lower extremities; occasionally climb ramp/stairs, balance, stoop, kneel, crouch, and crawl; never climb ladder/rope/scaffolds; and avoid concentrated exposure extreme cold, extreme heat, wetness, humidity, and hazards (machinery, heights, etc.). Tr. at 1059–60, 1062.

Plaintiff followed up with Dr. Marko for depression on September 15, 2010. Tr. at 1150–52. Plaintiff reported slight improvement in symptoms, but indicated that he continued to experience periodic depression, tearfulness, and worthlessness/inadequacy. Tr. at 1150. Dr. Marko assessed a GAF score of 60. Tr. at 1152.

On September 29, 2010, Plaintiff followed up with Dr. Marko for depression. Tr. at 1147–49. Plaintiff's wife reported improvement in Plaintiff's anger and irritability, but Plaintiff reported that he continued to struggle with depression. Tr. at 1147. Dr. Marko assessed a GAF score of 60. Tr. at 1149.

On November 2, 2010, Plaintiff was admitted to East Cooper Medical Center for lumbar decompression at L3-4 and L4-5 bilaterally. Tr. at 1104–05.

Plaintiff followed up with Suzanne Livengood, PA-C, in Dr. Richardson's office for his first post-operative visit on November 9, 2010. Tr. at 1114. He reported improvement in pain of 70 percent, but he also indicated that his pain was worsened with standing, walking, and bending and improved by blocks and medications. *Id.* His incision was noted to be healing well, and he was instructed to follow up in four weeks. *Id.*

21

Plaintiff next followed up with Ms. Livengood on December 7, 2010.  Tr. at 1111.
Plaintiff complained of pain in his low back and hips.  *Id.*  Ms. Livengood noted that
Plaintiff ambulated with antalgic gait; that he had 5/5 musculoskeletal strength in the
bilateral lower extremities; and that he had negative straight leg raise, but did complain of
pain in the upper legs when raising them.  *Id.*  Ms. Livengood instructed Plaintiff that it
was not uncommon to have pain one month out from the lumbar decompression
procedure, and referred Plaintiff back to Dr. Maguire to obtain narcotic medications.  *Id.*

Plaintiff followed up with Dr. Maguire on December 4, 2010, December 21, 2010
and April 8, 2011 regarding low back pain.  Tr. at 1123–1124.  Dr. Maguire's notes are
generally illegible and indicate no objective findings other than Plaintiff's blood pressure.
*Id.*

On December 8, 2010, Plaintiff followed up with Dr. Marko for depression.  Tr. at
1144–46.  Plaintiff reported that he was doing "pretty good."  Tr. at 1144.  Dr. Marko
assessed a GAF score of 60.  Tr. at 1146.

On December 28, 2010, Plaintiff presented to Dr. Woodfield for routine cardiac
follow up.  Tr. at 1128.  Dr. Woodfield indicated that Plaintiff's prescription for Effient
could be discontinued and that Plaintiff would need to follow up again in one year.  *Id.*

Plaintiff presented to Dr. Marko for depression follow up on February 2, 2011.  Tr.
at 1141–43.  Plaintiff indicated that he had been doing well, but that he had not been
motivated to do anything for the past week.  Tr. at 1141.  Dr. Marko assessed a GAF
score of 60.

On April 6, 2011, Plaintiff followed up with Dr. Marko for treatment of depression. Tr. at 1138–40. Plaintiff reported depressed mood with occasional spontaneous tearfulness, irritability, and some anhedonia. Tr. at 1138. He reported some anxiety over financial matters. *Id.* Plaintiff reported that "he continues to expand his gumball business and is doing better than he ever has in this regard." *Id.* Dr. Marko discontinued Celexa and prescribed Prozac. Tr. at 1139. He assessed a GAF score of 60. Tr. at 1140.

Plaintiff followed up with Dr. Marko for depression on May 4, 2011. Tr. at 1135–37. Dr. Marko indicated that Plaintiff was quite irritated and agitated. Tr. at 1135. Plaintiff reported depressed mood, anhedonia, amotivation, and anergy. *Id.* He also indicated that he felt "nervous" all the time and that he experienced increased heart rate and increased breathing. *Id.* Plaintiff indicated that he was having a conflict with his neighbor and that he was afraid his neighbor would see him "doing something and report it to the disability board." *Id.* Dr. Marko recommended that Plaintiff start Zoloft, but Plaintiff declined the medication. Tr. at 1136. Dr. Marko assessed a GAF score of 60. Tr. at 1137.

On June 10, 2011, Dr. Maguire completed a treating physician's statement. Tr. at 1157–64. Dr. Maguire wrote that he was board certified in internal medicine and that he had practiced medicine for 23 years. Tr. at 1157. He indicated that he reviewed Plaintiff's records; that he served as a consultative examiner; and that he was Plaintiff's treating primary care physician from May 2004 through June 2011. Tr. at 1158. He indicated that Plaintiff's diagnoses included low back pain, coronary artery disease, depression,

sleep apnea, restless leg syndrome, and high cholesterol.  *Id.*  He indicated that Plaintiff was limited as follows: occasionally lift and/or carry less than 10 pounds; no frequent lifting/carrying; stand and/or walk less than two hours in an eight-hour workday; use of cane for walking or for bending/stooping at all times; push and/or pull (including hand/foot controls) limited in lower extremities; sitting (with normal breaks) at least two hours in an eight-hour workday; occasionally bend at the waist; frequent position changes; frequent and/or unscheduled breaks; alternate sitting and standing; significant limitation in concentration and attention to tasks of 50 percent or more of workday or workweek; work absences four or more days per month due to episodes of increased symptoms; and medical treatment during working hours four or more days per month. Tr. at 1159–63.  Dr. Maguire further noted that Plaintiff had no ability to sustain work activity at any functional level due to pain, fatigue, or other subjective symptoms and that Plaintiff's impairment was permanent with no expected improvement.  Tr. at 1163.

On June 14, 2011, Dr. Maguire wrote a letter indicating that Plaintiff had low back pain for which he was not a surgical candidate; that Plaintiff took high-dose narcotics; that Plaintiff's severe pain greatly limited all activity; that Plaintiff had coronary artery disease and high cholesterol, but that he had no problems as a result of those impairments; that Plaintiff's sleep was impaired by restless leg syndrome and sleep apnea; and that Plaintiff had depression.  Tr. at 1156.  He also wrote, "[h]e is fully disabled in my opinion due to the severe LBP and other conditions listed above."  *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

24

a.     Plaintiff's Testimony

At the hearing on June 17, 2011, Plaintiff stated that he drove to the hearing and that he drove an average of 10–15 miles per week.  *Id.*  He testified that he lived with his wife and three-year-old daughter.  Tr. at 68.  He stated that he could read a newspaper, write a letter, add, and subtract.  *Id.*  He testified that he was left handed.  *Id.*

Plaintiff stated that he last worked in 2006 as a roll-off truck driver.  *Id.*  He testified that he previously drove a dump truck for Bishop Construction.  Tr. at 69.  He also stated that he worked as a metal stud framer and a sheetrock hanger for Bonitz Contracting.  *Id.*  He testified that he engaged in self-employment as a landscaper and a roofer from 1998–2000.  *Id.*  He also stated that he worked at St. Francis Hospital as a maintenance man and a nurse's attendant.  *Id.*  The ALJ asked Plaintiff about jobs at Basal Services and Fazoli's Restaurants, but Plaintiff indicated that he did not remember those jobs.  Tr. at 69–70.

The ALJ also asked Plaintiff about a gumball business.  Tr. at 70.  Plaintiff indicated that it was his wife's business, but that he went along with her to pick up candy from Sam's and that he helped his wife out on routes sometimes.  *Id.*  The ALJ asked Plaintiff why he indicated to his physician that it was his business.  Tr. at 71.  Plaintiff testified that he was confused.  *Id.*

The ALJ then asked Plaintiff about a comment Plaintiff made to his physician about being worried that his neighbor would see something and report it to the disability board.  *Id.*  Plaintiff stated that he did not understand and further stated that he had a problem with his neighbor.  Tr. at 72.

Plaintiff testified that he could not go back to work because he could not sit or stand for long periods. *Id.* He indicated that he experienced back pain and left heel pain. *Id.* He testified that he had problems remembering and that he hurt constantly. Tr. at 73.

Plaintiff testified that he worked on small engines and other small projects in his garage during the day. *Id.* He stated that he could do that work for about an hour before going to lie down. *Id.*

Plaintiff testified that he was learning to play the guitar. *Id.* He stated that he last went fishing a few months before the hearing. Tr. at 74. The ALJ asked Plaintiff about a comment he made to his doctor that he felt guilty taking time off to have fun. *Id.* Plaintiff testified that he felt guilty for being hurt, for not being able to help his wife around the house, and for not being able to care for his family. Tr. at 74–75.

Plaintiff testified that his low back, left heel, and left shoulder hurt. Tr. at 75. He stated that he had problems with his memory. Tr. at 76. Plaintiff testified that he had been seeing Dr. Marco for depression, but that he had been depressed for most of his life. Tr. at 77. Plaintiff stated that he did not have much of a problem with his right wrist. *Id.* He testified that he used a cane quite a bit, and that Dr. Maguire recommended he use it. Tr. at 77–78. Plaintiff testified that he treated with Dr. Maguire since 2003. Tr. at 78.

Plaintiff initially denied difficulty staying awake, alert, or thinking clearly as a result of medication use. Tr. at 79. However, he subsequently stated that the narcotics made him loopy. *Id.*

Plaintiff testified that he needed to lie on a heating pad on the floor and put his legs up during the day. Tr. at 80.

Following Plaintiff's testimony, there was a lengthy discussion between Plaintiff's attorney and the ALJ about Plaintiff's credibility.  Tr. at 81–86.

b.    Vocational Expert Testimony

Vocational Expert ("VE") J. Adger Brown, Jr. reviewed the record and testified at the hearing.  Tr. at 87–96.  The VE categorized Plaintiff's PRW as a drywall installer, DOT number 842.684-014, skilled, SVP of 6, medium; framer, DOT number 860.381-022, skilled, SVP of 7, medium; heavy truck driver, DOT number 905.663-014, semi-skilled, SVP of 4, medium; roofer, DOT number 866.381-010, skilled, SVP of 7, medium; landscape laborer, DOT number 408.684-010, semi-skilled, SVP of 4, heavy; and nursing assistant, DOT number 355.674-014, semi-skilled, SVP of 4, medium.  Tr. at 88.  The ALJ asked whether there were jobs that a hypothetical individual of Plaintiff's vocational profile could perform with the following limitations:  he could sit for six hours in an eight hour day with normal breaks; he could stand and walk two hours in an eight-hour day, for 15 to 30 minutes at a time; he could lift 20 pounds occasionally and 10 pounds frequently; he must avoid operating foot controls with his left lower extremity; he must avoid climbing ropes, ladders, and scaffolds; he could occasionally perform postural activities; he must avoid concentrated exposure to heat, cold, wetness, and humidity; he must avoid unprotected heights and dangerous, moving machinery; he would be limited to simple, routine, repetitive tasks with no more than occasional contact with co-workers; and he must avoid interaction with the general public.  *Id.*  The VE testified that the hypothetical individual could perform the sedentary, unskilled jobs of quality control examiner, DOT number 739.687-182, with 450 in South Carolina and 14,000 in the

United States; assembler, DOT number 732.587-010, with 1,600 in South Carolina and 106,000 in the United States; and parts packer, DOT number 920.687-030, with 100 in South Carolina and 6,600 in the United States. Tr. at 89–90.   The ALJ then asked if a person performing those jobs could alternate sitting and standing.  Tr. at 90.  The VE indicated that the jobs could be performed if the person could remain in one position for an hour before alternating positions, but that if the person had to alternate positions every 30 to 45 minutes, the number of jobs would be reduced by one-half to one-third.  *Id.*  The ALJ then asked the VE if the need to use a cane in the left dominant hand would allow the person to perform the jobs.  *Id.*  The VE testified that using a cane would not limit the performance of the jobs identified.   *Id.*   Plaintiff's attorney questioned the VE on limitations assessed by Dr. Maguire.  Tr. at 91.  Plaintiff's attorney asked whether the ability to only occasionally bend at the waist would affect the ability to perform the identified jobs.  *Id.*  The VE indicated that it would not.  *Id.*  Plaintiff's attorney next asked the VE if a need to leave the work station each hour for a two to five minute unscheduled break would affect the ability to perform the jobs.  *Id.*  The VE testified that it would not.  *Id.*  Plaintiff's attorney asked the VE how often an employee could get up and leave a work station.  Tr. at 92.  The VE testified that an employee was not supposed to leave the work station, but that generally six hours or less at the work station per day would not allow for the performance of a job.  *Id.*  Plaintiff's attorney next asked the VE if a worker could perform the jobs identified if he were limited in his ability to attend and concentrate on a work task by 10 to 20 percent per day.  Tr. at 93.  The VE testified that an employee must be on task for about 85 percent of the work day in order to perform a

job. *Id.*  Plaintiff's attorney asked the VE what is generally tolerated in the national economy with respect to absenteeism. *Id.*  The VE testified that for the unskilled jobs identified, anything more than two days per month would be considered excessive.  Tr. at 94.  Plaintiff's attorney asked if that statement would apply if absences were due to medical treatment. *Id.* The VE responded that absences due to medical treatment would be factored in to that assessment and that "[i]t still comes back to the are you there, putting in the time at the job?" *Id.*  Plaintiff's attorney asked if an inability to perform bending, crouching, crawling, stooping, and kneeling would affect the identified jobs. *Id.* The VE testified that it would not. *Id.*  The ALJ asked if climbing, jumping, or running were required.  Tr. at 94–94.  The VE testified that they were not.  Tr. at 95.  The ALJ asked if weakness at the non-dominant wrist would affect the ability to perform the identified jobs. *Id.*  The VE responded that it would not as long as the worker had good use of the dominant hand and the non-dominant hand could still be used as a reliable helper. *Id.*

2.    The ALJ's Findings

In her decision dated July 20, 2011, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2010.
2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of September 1, 2009, through his date last insured of December 31, 2010 (20 C.F.R. § 404.1571, *et seq.*).
3.    Through the date last insured, the claimant had the following severe impairments:  coronary artery disease, restless leg syndrome, degenerative disc disease of the lumbar spine, side effects of medications, left heel pain, and depression (20 C.F.R. § 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the criteria of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to sit for 6 hours in an 8 hour day, with normal breaks, and stand and walk for 2 hours in an 8-hour day, for 15 to 30 minutes at a time. He could lift 20 pounds occasionally and 10 pounds frequently. The claimant had to avoid operating foot controls with his left lower extremity, and he had to avoid climbing ropes, ladders, and scaffolds. The claimant could otherwise perform postural activities occasionally. He had to avoid concentrated exposure to heat, cold, wetness, and humidity. He had to avoid unprotected heights and dangerous, moving machinery. The claimant could perform only simple, routine and repetitive tasks with no more than casual contact with coworkers, and he had to avoid interaction with the general public. The claimant has completed high school, but can read at the 10th grade level, write at the 7th grade level, and add and subtract at the 4th grade level. The clamant is left-hand dominant.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 C.F.R. §404.1565).

7.  The claimant was born on May 7, 1962, and was 48 years old, which is defined as a younger individual age 18–49, on the date last insured (20 C.F.R. § 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 C.F.R. § 404.1564).

9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from September 1, 2009, the amended alleged onset date, through December 31, 2010, the date last insured (20 C.F.R. § 404.1520(g)).

Tr. at 37–55.

D.  Appeals Council Review

Plaintiff's attorney submitted a Request for Review of Hearing Decision to the Appeals Council on September 2, 2011.  Tr. at 33.  On March 20, 2013, the Appeals Council issued a notice denying Plaintiff's request for review.  Tr. at 1–4.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)      The ALJ improperly rejected Dr. Maguire's treating physician opinions, and the ALJ's residual functional capacity ("RFC") findings were not supported by substantial evidence; and

2)      The ALJ committed reversible error by failing to consider the effect of frequent medical treatment on Plaintiff's ability to remain gainfully employed.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in her decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[1] (4) whether such impairment prevents claimant from performing PRW;[2] and (5) whether the impairment prevents him from doing substantial gainful employment.  *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary.  20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can

---

[1] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity.  20 C.F.R. § 404.1525.  If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment.  20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria."  20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[2] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

## 2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*; *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     ALJ's Rejection of Dr. Maguire's Opinion in Determining RFC

Plaintiff argues that the ALJ improperly rejected Dr. Maguire's treating physician opinions and that the ALJ's findings with respect to Plaintiff's RFC were not supported by substantial evidence. [Entry #18 at 24]. The Commissioner argues that the record as a whole supports the ALJ's RFC finding. [Entry #21 at 12]. The Commissioner also

argues that Dr. Maguire's opinion lacks objective support and is inconsistent with other substantial evidence of record.  [Entry #21 at 16–22].

In evaluating opinion evidence, the ALJ must evaluate every medical opinion received.  20 C.F.R. §404.1527(c). Courts evaluate and weigh medical opinions based primarily on the following: (1) whether the physician has examined the applicant; (2) the treatment relationship between the physician and the applicant, including the length of the treatment relationship, the frequency of examination, and the nature and extent of the treatment relationship; (3) the supportability of the physician's opinion; (4) the consistency of the opinion with the record; and (5) whether the physician is a specialist. 20 C.F.R. §404.1527(c); *see also* 434 F.3d at 654.

If a treating source's medical opinion is well-supported and not inconsistent with the other substantial evidence in the case record, it will be given controlling weight.  SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (finding a physician's opinion should be accorded "significantly less weight" if it is not supported by the clinical evidence or if it is inconsistent with other substantial evidence).

The ALJ's RFC assessment should be based on all the relevant evidence.  20 C.F.R. § 404.1545(a).   The RFC assessment must "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR

96-8p.  The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ."  *Id.*  The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule.  *Id.*

The ALJ considered the medical opinion evidence in the record in accordance with the provisions of 20 C.F.R. § 404.1527(c), and she determined Plaintiff's RFC in accordance with the provisions of 20 C.F.R. § 404.1545(a) and SSR 96-8p.  She indicated whether particular medical providers were acceptable medical sources pursuant to 20 C.F.R. § 404.1513(a).  She indicated the examining and treatment relationships between Plaintiff and the medical providers.  The ALJ cited each medical opinion and discussed her reasons for accepting or rejecting each opinion in whole or in part.  She specifically considered the July 2007 opinion of Dr. Waid that Plaintiff's neurocognitive and educational deficits would be a significant obstacle to employment, but rejected this opinion because it was refuted by subsequent evidence.  Tr. at 51.  She considered the November 2008 opinion of Ms. Johnson that Plaintiff tolerated a full day of activity at the sedentary to light level, and concluded that Ms. Johnson's assessment was consistent with the RFC set forth in the decision.  Tr. at 48–49.  The ALJ gave significant weight to the October 2008 opinion of Dr. Taylor, who opined that Plaintiff's cognitive impairment did not affect his ability to participate in vocational rehabilitation and should not significantly interfere with vocational efforts.  Tr. at 51.  She found that Dr. Taylor's opinion was consistent with the other evidence in the record.  *Id.*  She discussed the June 2009 opinion of Dr. Kolehma that Plaintiff should continue with the restrictions imposed by his

36

surgeon, including no climbing; no jumping or heavy pounding on the left leg; no driving with a clutch; and no running, walking, or standing for extended periods of time.  Tr. at 49.  The ALJ found that Dr. Kolehma's opinion was consistent with that of Dr. Jaskwhich, and consistent with the RFC determination in the decision.  *Id.*  She considered and gave some weight to Dr. Jaskwhich's April and June 2008 opinions that Plaintiff should limit climbing and walking by determining that Plaintiff was limited in the amount of time that he could walk and that he was restricted from climbing ladders, ropes, and scaffolds.  *Id.*  The ALJ considered the opinion of Julie Jackman, PT, that Plaintiff could perform sedentary to light work with no kneeling, crouching, stooping, climbing, or crawling and that Plaintiff would likely benefit from changing positions from sitting, standing, and walking.  *Id.*  The ALJ determined that Ms. Jackman's opinion was consistent with the RFC determination.  *Id.*

The ALJ adequately explained her reasons for failing to give controlling weight to Dr. Maguire's opinion.  She noted that she accorded it little weight for the following reasons: because the issue of disability is reserved for the Commissioner; because the opinion was rendered several months after the claimant's date last insured; because Dr. Maguire did not cite any specific, clinical abnormalities to support the limitations he imposed; and because the medical evidence from the relevant period at issue did not indicate that Plaintiff was as limited as Dr. Maguire perceived.  Tr. at 50.  The ALJ also noted that the restrictions imposed by Dr. Maguire were inconsistent with Plaintiff's own reported activities.  *Id.*

The ALJ indicated that, in determining Plaintiff's RFC, she gave some deference to Dr. Maguire's opinion that Plaintiff could stand and/or walk for less than two hours and for no more than 15 to 30 minutes at a time. *Id.* The ALJ indicated that she considered Plaintiff's fatigue, pain, depression, and medication side effects in determining that Plaintiff was limited to simple, routine, and repetitive tasks, but that those symptoms did not limit the claimant to the extent Dr. Maguire suggested when he indicated that Plaintiff's attention and concentration would be limited for 50 percent of the workday. *Id.* The ALJ concluded that Dr. Maguire's opinion that Plaintiff would likely be absent from work for four or more days per month due to symptoms and related treatment was not supported by the medical record. Tr. at 50–51. She noted that recent treatment notes reflected that Plaintiff exhibited good concentration and was sleeping well. Tr. at 50.

The ALJ's conclusions with respect to Dr. Maguire's opinion are supported in the record. While Plaintiff experienced a massive heart attack in September 2009, he had significantly recovered from a cardiac standpoint by June 2010. Tr. at 845–47, 1129. Although Plaintiff complained of exacerbation of low back pain on October 29, 2009, the objective evidence showed no change in his lumbar spine since 2004, negative EMG/nerve conduction study, negative straight leg raise, normal reflexes, and normal motor function in his lower extremities. Tr. at 968, 973–74, 989, 999, 1004. While Plaintiff received multiple treatments in 2010, including physical therapy, epidural steroid injection, nerve block, rhizotomy, and minor surgery, his back pain had improved significantly by the end of 2010. Tr. at 972, 993–94, 1091–1103, 1108–09, 1114.

Plaintiff complained of depression beginning in January 2010, but by December 2010, his symptoms were stable and treatment was only recommended every eight weeks.  Tr. at 981, 1146.  Dr. Maguire's opinions were rendered in June 2011, and they were indicated to be an assessment of Plaintiff's then-current impairments and restrictions.  Tr. at 1156, 1157–64.  However, as the ALJ indicated, Dr. Maguire's opinion was inconsistent with the findings in the most recent records.  Tr. at 50–51.

The undersigned recommends a finding that the ALJ properly considered Dr. Maguire's opinion in assessing Plaintiff's RFC in light of the opinion's lack of support and inconsistency with other substantial evidence in the case record.

### 2.    Frequency of Medical Treatment

Plaintiff alleges that the ALJ failed to consider Plaintiff's inability to sustain work on a regular and continuing basis due to excessive absenteeism caused by frequent medical treatment.  [Entry #18 at 32–36; Entry #32].  Plaintiff adds that the ALJ should have at least found that Plaintiff was disabled during the period from September 1, 2009, through December 31, 2010, because of the frequency of treatment.  [Entry #32].  Plaintiff argues that, in light of the VE's testimony indicating that absences in excess of two days per month would preclude all work, the ALJ erred in failing to make specific findings regarding the frequency of Plaintiff's treatment.  [Entry #32 at 4].  The Commissioner states that Plaintiff is lumping all treatment together in an attempt to meet the statutory 12-month duration requirement for disability.  [Entry #21 at 23].  The Commissioner argues that the ALJ did consider the frequency of Plaintiff's treatment and

that Plaintiff's impairments had improved and his treatment had decreased by June of 2010. *Id.*

"The RFC assessment must be based on all of the relevant evidence in the case record, such as . . . [t]he effects of treatment, including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency of treatment, duration, disruption of routine, side effects of medication) . . ." SSR 96-8p. "[I]f an individual's medical treatment significantly interrupts the ability to perform a normal, eight-hour workday, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000) (providing that ALJ should consider the effect of ongoing treatment where the record indicated that Newton visited the doctor, hospital, and emergency room frequently during the period in question and occasionally slept for several hours during the day because of illness and treatment); *accord Epps v. Harris*, 624 F.2d 1267, 1273 (5th Cir. 1980) (remanding for consideration of the disabling effect on Epps of traction used to alleviate back pain three to four times daily); *see also Meyer v. Astrue*, 662 F.3d 700, 707 n.3 (4th Cir. 2011) (instructing Commissioner to consider the effect of more than 170 physical therapy sessions on Meyer's ability to remain gainfully employed during the period of claimed disability).

It is the policy of the Social Security Administration to establish a closed period of disability when the evidence indicates that a claimant was disabled for a continuous period of 12 months, even if the claimant is no longer disabled by the time a disability determination is made. Soc. Sec. Admin. Program Operations Manual Sys., § DI

25510.001. "The ALJ is required to consider a closed period of disability if evidence in the record supports a finding that a person is disabled for a period of not less than twelve months." *Rosales v. Colvin*, 2013 WL 1410387, at *4 (D. Ariz. Apr. 8, 2013); *accord Reynoso v. Astrue*, No. CV 10-04604-JEM, 2011 WL 2554210, at *3 (C.D. Cal. June 27, 2011); *Johnson v. Astrue*, No. CV 07-7263§, 2008 WL 5103230, at *4 (C.D. Cal. Dec. 2, 2008).

In *Williams v. Astrue*, the United States District Court for the Northern District of Texas considered *Newton*, but concluded that substantial evidence supported the ALJ's findings regarding Williams' medical appointments where Williams did not raise the issue of frequent medical appointments as grounds for being unable to work and where there was no evidence that Williams would require a similar number of appointments in the future. *Williams v. Astrue*, 2010 WL 5175590, at *3 (N.D. Tex. Feb. 11, 2010). Plaintiff's case is similar to *Williams* in that there was no evidence that Plaintiff would require a similar number of appointments in the future. However, Plaintiff's case differs from *Williams* in that Plaintiff asserted, through submission of Dr. Maguire's opinion and through his attorney's examination of the vocational expert during the hearing, that Plaintiff's medical appointments would result in frequent absenteeism and that absenteeism in excess of two days per month would be excessive.

The undersigned's review of the medical evidence for the period from the amended alleged onset date of September 10, 2009, through the date last insured of December 31, 2010, indicates that medical treatment was received on the following dates: September 10–22, 2009; September 28–29, 2009; October 1, 2009; October 2, 2009;

October 6, 2009; October 7, 2009; October 13, 2009; October 16, 2009; October 23, 2009; October 29, 2009; November 13, 2009; November 19, 2009; November 23, 2009; December 3, 2009; December 8, 2009; December 17, 2009; December 18, 2009; December 22, 2009; December 30, 2009; January 4, 2010; January 6, 2010; January 21, 2010; January 27, 2010; January 29, 2010; February 4, 2010; February 17, 2010; February 25, 2010; March 4–5, 2010; March 19, 2010; March 24–25, 2010; April 5, 2010; April 12, 2010; April 15, 2010; April 20, 2010; April 21, 2010; April 22, 2010; April 23, 2010; April 26, 2010; April 28, 2010; May 3, 2010; May 4, 2010; May 7, 2010; May 11, 2010; May 13, 2010; May 18, 2010; May 20, 2010; May 24, 2010; May 25, 2010; May 27, 2010; June 8, 2010; June 9, 2010; June 15, 2010; June 29, 2010; July 12, 2010; July 13, 2010; July 27, 2010; August 10, 2010; August 11, 2010; August 25, 2010; August 31, 2010; September 15, 2010; September 23, 2010; September 29, 2010; November 2, 2010, November 9, 2010, December 7, 2010; December 8, 2010; December 14, 2010; December 21, 2010, and December 28, 2010.  Plaintiff also participated in cardiac rehabilitation from October 19, 2009, through December 30, 2009, but all dates of cardiac rehabilitation are not specified in the record.  In the period after the date last insured and before Plaintiff's hearing, he received medical treatment on February 2, 2011, April 6, 2011, April 8, 2011, and May 4, 2011.

The ALJ failed to address the effects of Plaintiff's treatment and the mechanics of Plaintiff's treatment during the relevant period from September 9, 2009, through December 31, 2010.  The ALJ summarily concluded that the medical record did not indicate that Plaintiff required medical treatment four or more times per month on a

42

regular basis. Tr. at 50–51. While the ALJ was correct in concluding that the record did not support a finding that Plaintiff would require continuing medical treatment on four or more days per month, she neglected to consider Plaintiff's past treatment needs. The record reflects that for each month between September 2009 and December 2010, with the exception of October 2010, Plaintiff received some type of medical treatment on at least three days. During many months, Plaintiff's treatment significantly exceeded three days per month. The ALJ erred in failing to consider the frequency of Plaintiff's treatment from the alleged onset date through the date last insured in light of the VE's testimony, which indicated that absences more frequently than twice a month would be considered excessive in a workplace.

The undersigned recommends a finding that the ALJ erred in failing to consider a closed period of disability where the medical evidence suggests that the frequency and mechanics of treatment imposed significant limitations in Plaintiff's ability to perform a normal, eight-hour workday over not less than a twelve-month period.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of

42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

July 28, 2014
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).